IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

American Standard, Inc.,                                    Case No. 3:07CV02377

              Plaintiff,

       v.                                                            ORDER

Robert J. Meehan, Jr. et al.,

              Defendants.

       This is a tort and contract dispute. Plaintiff American Standard, Inc. [Trane], which

manufactures Trane brand heating, ventilating, and air conditioning [HVAC] systems, claims that

defendant Robert J. Meehan, owner of a Trane franchise [Toledo Trane], fraudulently failed to

account for monies owed by Toledo Trane to the plaintiff. Meehan counterclaims, alleging that

certain guidelines on which plaintiff bases its claims violate the Sherman Anti-Trust Act, 15 U.S.C.

§ 1. Jurisdiction is proper pursuant to 28 U.S.C. § 1332.

       Pending are motions by Meehan and Toledo Trane for a temporary restraining order and

preliminary injunction. [Doc. 13]. Following hearings and briefing, the motions are decisional.

       For the following reasons, the motion for a temporary restraining order and preliminary

injunction preventing Trane from terminating the contract is denied.

**Background**

1

Plaintiff Trane sells its products through either: 1) direct sales on the open market; or 2) distribution to independent franchisees exclusively responsible for various regions throughout the United States.

In 1959, Meehan began working as a salesman for Trane. In 1971, Meehan approached Trane executives expressing interest in opening an independent Trane franchise center. After a series of meetings, Meehan was given the opportunity to establish a Trane franchise in Toledo. Meehan accepted Trane's offer and signed a franchising agreement.

Included in the franchise agreement were two provisions pertinent to the pending motions. The first is that either party may terminate the agreement on thirty days notice to the other party. The second is that "no amendment, supplement or modification [of the contract] shall be of any force and effect unless it is signed in writing and signed by the party to be charged." [Doc. 15]. The contract also provided that Wisconsin law governed all provisions.

Meehan alleges that when he began operating his franchise, which had previously been operated by another franchisee, he found the business in dire circumstances. Realizing that substantial investment would be necessary to make the business profitable, he allegedly became concerned about the thirty day termination clause. If exercised by Trane, Meehan realized he could lose any investment, because he could not transfer the franchise without Trane's approval.

In the Summer of 1971, Maurie Rice, then Midwestern Regional Manager for Trane, visited Meehan to help formulate plans about expanding the franchise. During that visit, as Rice and Meehan were driving through a residential neighborhood, they discussed the termination provision. As described by Meehan, Rice generally communicated that "it was not the custom of Trane to – or operating practice . . . of Trane to terminate without cause." Meehan does not recall the exact

2

words which Rice used. There were no further discussions about the thirty day termination clause during that visit. (Meehan Dep. at 69:12 - 70:9)

At some point during the late 1970's or mid 1980's, according to Meehan, he had a similar conversation with Don O'Keefe, Trane's National Sales Manager, during a Trane Managers meeting.[1] Encountering O'Keefe in a "buffet breakfast line," Meehan asked about Trane's policy pertaining to the termination of its franchises. O'Keefe allegedly responded that "in his experience, Trane had not cancelled a franchise other than for cause." (*Id.* at 82:17 - 23.)

In the mid-1990's, Meehan again allegedly contacted Trane concerning its termination policy. He raised his concerns with Steve Miclette [whose position with Trane is not clear from the record]. Miclette, according to Meehan, responded: "Bob, in the first place, if it comes down to a difference of opinion . . . that Trane would always side with the franchise holder. And that their policy or that he had never seen Trane terminate anybody for a threat like this . . . ." (*Id.* at 90:17 - 92:2.).

Since 1971, Toledo Trane has grown significantly and prospered. In addition to selling Trane products, Toledo Trane sells parts for other manufacturers and manages a separate service division. Toledo Trane's income comes primarily from sales of new commercial HVAC systems [consisting solely of Trane parts]; sales of controls [90% of which are produced by Trane]; and the sale of other Trane manufactured parts. Toledo Trane's service division generates about one-third of its income.

In March, 1992, Trane issued a "Manual of Policies and Procedures" [MOPP] for its franchisees. Two sections of Provision 34b are of particular importance to this case. First, the contract  required that all Trane franchises report to Trane sales of non-Trane products and pay

---

[1]

Trane denominates its franchisees as "Managers."

Trane a percentage of those sales. Second, through a complicated incentive structure, MOPP 34b set minimum limits on the sale price of all Trane products and maximum limits on the sale price of all non-Trane products.

Meehan acquiesced in these provisions and undertook to follow and implement their requirements.

The events giving rise to this suit began with an audit by Trane of Toledo Trane in June, 2005. Trane alleges that the audit uncovered significant noncompliance by Toledo Trane with the MOPP and a resulting shortfall in payments from Toledo Trane of over a million dollars. Trane thereon exercised the thirty day termination provision of the franchise agreement. In addition, it filed the instant suit.

Toledo Trane seeks injunctive relief to prevent termination of its franchise pending adjudication of the litigation. It contends that, if this court allows termination to occur, the well-being and, perhaps, even the existence of its business will be jeopardized.

## Discussion

### 1. Temporary Restraining Order/Injunction Standards

The same standards generally apply to the issuance of temporary restraining orders and preliminary injunctions. *Northeast Ohio Coal. for Homeless & Serv. Employees Intern. Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006); *see also Rios v. Blackwell*, 345 F.Supp.2d

833, 835 (N.D. Ohio 2004).[2] To grant either form of injunctive relief, a court must consider and

balance:

---

[2]

Meehan contends that the standard for a preliminary injunction has developed into a alternate "balance of hardships test," as set forth in *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100 (6th Cir. 1982). This alternate test, first developed in *Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973), requires: 1) a showing of "sufficiently serious questions going to the merits" and 2) a "balance of hardships tipping decidedly toward the party requesting the preliminary relief." The court in *Friendship Materials* held that the district court abused its discretion in issuing a preliminary injunction without making findings of irreparable injury to the plaintiff. Accordingly, the court retained the irreparable harm requirement in the alternate test.

The Sixth Circuit referenced its *Friendship Materials* decision in *In re Eagle-Picher Industries, Inc.*, 963 F.2d 855 (6th Cir. 1992), stating:

> a court may, in its discretion, grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued.

*Id.* at 105.

An examination of more recent cases reveals no Sixth Circuit decisions since 1997 which expressly endorse and apply the substantial question/balance of hardships test. Later Circuit and district court opinions refer, rather, to *Friendship Materials* and *Eagle-Picher Industries* either to: 1) highlight the irreparable injury requirement of the conventional four-factor test for injunctive relief, *see, e.g., Patio Enclosures, Inc. v. Herbst*, 39 Fed.Appx. 964, 967 (6th Cir. 2002) (referencing *Friendship Materials*); or 2) to show that the four-factor standard provides somewhat flexible guidance, rather than prescribing rigid requirements, *see, e.g., Suster v. Marshall*, 149 F.3d 523, (6th Cir. 1998) (referencing *Eagle-Picher Industries*).

Further, the "sufficiently serious questions going to the merits" standard, which is a lower standard than the traditional four-factor standard, *Harris v. Equilon Enter., LLC*, 107 F. Supp 2d 921, 924 (S.D. Ohio 2000), appears more recently to be limited to actions arising under the Petroleum Marketing Practices Act (PMPA). Congress, noting that the "franchise relationship in the petroleum industry is unique," *Massey v. Exxon Corp.*, 942 F.2d 340 (6th Cir. 1991), and thus enacted that statute in 1978 to protect motor fuel marketing franchises.

I conclude, accordingly that the substantial question/balance of hardships test is not appropriate in this case. I will rely on and apply the conventional four factor test to the pending motions.

5

(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent a stay; (3) whether granting the stay would cause substantial harm to others; and (4) whether the public interest would be served by granting the stay.

*Northeast Ohio*, *supra*, 467 F.3d at 1009; *see also Rios*, *supra*, 345 F.Supp.2d at 835.

These factors are interrelated considerations to be balanced together, not independent prerequisites. *Northeast Ohio*, *supra*, 467 F.3d at 1009. As the party seeking the injunctive relief, Meehan has the burden of persuasion on each of these factors. *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978). A preliminary injunction is an extraordinary remedy which should only be granted if the movant carries his or her burden of persuasion. *Id.*

A district court is required to make specific findings concerning each of the four factors, unless fewer factors are dispositive of the issue. *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 717 (6th Cir. 2003). Because the considerations applicable to preliminary injunction decisions are factors to be balanced, "no single factor is determinative as to the appropriateness of equitable relief." *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 537 (6th Cir. 1978).

The nature and purpose of preliminary injunctions also inform the district court's analysis. As the Supreme Court has stated, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Given this limited purpose, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than would be found in the record of a trial on the merits. A party thus is not required to prove his case in full at a preliminary injunction hearing. *Id.*

**A. Likelihood of Success on the Merits**

6

To establish a likelihood of success on the merits, a party must show more than a mere possibility of success. However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

### i. The Termination Clause

Meehan presents two arguments against Trane's invocation of the thirty day termination clause: 1) the parties orally modified the contract [despite its requirement that all amendments be in writing] to allow termination only for cause; and 2) Trane is equitably estopped from terminating him without cause.

### (a). Oral Modification

As noted by the Wisconsin Supreme Court, "it is universally accepted that, unless a contract is one required by law to be in writing, the contract can be modified orally although it provides that it can be modified only in writing." *S & M Rotogravure Serv., Inc. v. Baer*, 252 N.W.2d 913, 920 (Wis. 1977); *see also* 4 Williston on Contracts § 591 (3d ed. Jaeger 1961); 6 Corbin on Contracts § 1295 (1962). When the parties demonstrate by words or conduct an intent to waive a provision requiring written change, courts will allow amendments to be oral. *S & M Rotogravure Serv., Inc.*, *supra,* 252 N.W.2d at 920; *Wiggins Construction Co. v. Joint School Dist.*, 151 N.W.2d 642, 645 (Wis. 1967); *Sterling Eng'r & Construction Co. v. Berg*, 152 N.W. 851, 853 (Wis. 1915).[3]

---

[3] Trane argues that whether a valid modification has occurred in fact requires more than a finding of an oral agreement to modify the contract. According to Trane, a two step inquiry is necessary, whereby the court first determines whether the parties agreed to waive the requirement that amendments be in writing, after which the court determines whether the parties agreed on the particular change in the contract.

To prove that the parties have modified a contract, the party asserting modification must demonstrate that the modification satisfies all the requirements of a valid contract, including mutual assent. *Kohlenberg v. Am. Plumbing Supply Co.*, 263 N.W.2d 496, 500 (Wis. 1978). New consideration is not required, however, if the original contract has yet to be fully performed by either party. *Smith v. Osborn*, 223 N.W.2d 913, 921 (Wis. 1977).

The Wisconsin Supreme Court has recently noted that: "certainty of contract terms and definiteness require mutual assent by way of a meeting of the minds." *Metropolitan Ventures, LLC v. GEA Assocs.*, 717 N.W.2d 58, 66 (Wis. 2006). There need not be a literal meeting of the minds because "mutual assent is judged by an objective standard." *Id.* The question is whether there is sufficient evidence to ascertain the intent of the parties. *Id.* In doing so, a court examines both the parties' language and the surrounding circumstances. *Id.*

The record fails to show that Meehan has a substantial likelihood of proving that the parties modified the original contract to substitute a provision requiring termination of the franchise only for cause, rather than on thirty days notice by any party.

---

Trane finds support for this two step approach in a series of federal court decisions, *Allen & O'Hara, Inc. V. Barrett Wrecking, Inc.*, 898 F.2d 512, 518 (7th Cir. 1990), unpublished cases from Wisconsin's lower state courts, *Beloit Corp v.C3 Datatec, Inc.*, 1995 WL 674602, at *11-15 (E.D. Wis. Aug. 23, 1995), *Mooney & Lesage & Assocs., Ltd. v. Germantown Marketplace, Inc.*, 1999 WL 1038247, at *1-2 (Wis. Ct. App. 1999), and cases involving waiver of potential causes of action. *See Wegner v. West Bend Mut. Ins. Co.*, 728 N.W.2d 30, 38 (Wis. Ct. App. 2006) (discussing waiver of a potential legal claim for contribution); *Preston v. Meriter Hosp., Inc.*, 700 N.W.2d 158, 165 (Wis. 2005) (discussing waiver of plaintiff's potential Emergency Medical Treatment and Active Labor Act claim).

The Wisconsin Supreme Court has, however, held that, if there has been a valid modification of the provision at issue, then by implication the parties have waived the clause requiring only written amendment. *See ABC Outdoor Advertising, Inc. v. Dolhun's Marine, Inc.*, 157 N.W.2d 680, 685 (Wis. 1968) (rejecting the argument that the oral contract was void because the prior contract required writing to cancel or terminate).

8

How a contract is to end is an important provision in any contract. To prove that the original provision was modified in a substantial and significant way, Meehan relies primarily on three conversations over the past thirty-five years. Each of those conversations is of dubious persuasive force.

More importantly, Meehan's recounting of these conversations fails to include a specific statement by the Trane participants that the Toledo Trane franchise would be terminated only for cause. Two of the conversations referred to past experience; the other, attributed to a Trane representative whose authority is not specified in the record, only postulated about what *would* likely occur given past experience.

Though, in view of the passage of time, the making of these tenuous statements might be difficult to refute, they remain vague generalizations, rather than express assurances extending indefinitely into the indeterminate future.

Meehan argues that the statements were made to induce him to invest money, time and effort in the Toledo franchise. Trane points out that, when it awarded the franchise to Meehan, it had another prospective purchaser; thus, it had no particular need to grant some special inducement to Meehan to revivify its Toledo franchise. Although new consideration is not a prerequisite to a modification, it is difficult to discern just what, if anything, would have motivated Trane to agree to give up or even moderate a provision that gave it great power. *See generally Caflisch v. Cross*, 1996 WL 670646 (Wis. Ct. App. 1996) (concluding a valid oral modification had occurred after finding the parties had reasons for changing their original agreement).

The context of an afternoon drive and, later, a buffet line, suggests that Trane's assertions were in the nature of "puffery." *See Ewers v. Eisenzopf*, 276 N.W.2d 802, 805-06 (Wis. 1979)

9

(stating that whether "puffery" may be construed as a guarantee depends upon the objective context in which the statement is made). None of the conversations between Meehan and Trane's employees occurred in the kind of business setting in which such negotiations would normally be conducted. Nor were any of the conversations part of a longer set of business negotiations, during which official business matters would be formally discussed and agreed upon.

### (b). Equitable Estoppel

In Wisconsin the doctrine of equitable estoppel has four elements: "1) action or nonaction; 2) on the part of one against whom estoppel is asserted; 3) which induces reasonable reliance thereon by the other, either in action or non action; and 4) which is to his or her detriment." *Affordable Erecting, Inc. v. Neosho Trompler, Inc.*, 703 N.W.2d 737, 741-42 (Wis. Ct. App. 2005), *aff'd*, 715 N.W.2d 620 (Wis. 2006). Under Wisconsin law, "proof of estoppel must be clear, satisfactory and convincing, and is not to rest on mere inference or conjecture." *Gabriel v. Gabriel*, 204 N.W.2d 494, 497 (Wis. 1973). The representation must have been made knowingly or with the intent that it would be acted upon. *Id.*

The actions relied on in this case are the words of Trane's representatives, spoken on three occasions to Meehan and relating to Trane's policy pertaining to the termination of its franchisees. It is unlikely, however, that the statements were made with either the knowledge or the intent that they would be relied on as having converted an at will contract to one requiring cause for termination. This is particularly true given the question, noted above, as to the probable lack of authority to bind Trane. As also discussed above, it is, futhermore, not clear why Trane would have sought to induce Meehan's investment in Toledo, by accepting a modification to its detriment, if other potential franchisees were available.

10

Wisconsin courts have recognized that "an equity action will not lie when the party seeking to invoke equity has failed to take reasonable steps to protect [its] interests." *Northwoods Care Vans v. Department of Health & Soc. Servs.*, 559 N.W.2d 924, 924 (Wis. Ct. App. 1996) (noting that a prudent person would get written confirmation before providing approximately $64,000 of additional services). Meehan made no effort to confirm these discussions in writing or with the speakers' supervisors.  This failure to follow up on something as important as he now claims these statements were, undercuts, rather than enhances, his claim of reliance.

Furthermore, given the context, which did not include any prolonged or serious discussions about conversion from at will to cause as the sole basis for termination, the statements appear closer to casual, off-hand remarks than contractual commitments. *See Commonwealth Tel. Co. v. Paley*, 233 N.W. 619, 621 (Wis. 1930) (finding reliance on a more or less casual remark to be unreasonable).

In my view, Meehan has not shown a reasonable likelihood of success on his estoppel claim, much less a substantial likelihood of success. This is particularly so in light of Wisconsin's requirement that the proof of equitable estoppel must be clear, satisfactory and convincing.

### ii. Cause for Termination

Meehan has to clear two hurdles to obtain his requested injunction. First he must persuade the court that, due to modification or equitable estoppel, Trane cannot terminate the franchise agreement with merely 30 days notice, but, rather, must provide cause for termination. This, for the reasons discussed above, he likely cannot do.

Even if he could clear this hurdle, he must  face Trane's claim that Meehan defrauded it and show that he has a substantial likelihood of prevailing on his defense to that claim. That defense is

11

that MOPP 34b, which Trane asserts Meehan violated by failing to pay over substantial sums due to Trane, violates federal anti-trust law. Unlike his predicate arguments on the issue of modification and equitable estoppel, his antitrust arguments appear to have merit.

### (a). The Alleged Tying Arrangement

Trane's complaint for damages against Meehan is based on its contention that Meehan defrauded it by failing to comply with provision 34b of the MOPP. The fraud about which Trane complains relates to the "variation program" prescribed in that provision.

In addition to giving rise to its complaint against Meehan, Trane contends that the breach of the variation program provides clear cause for terminating Toledo Trane's franchise. In response, Meehan alleges that the variation program amounted to an illegal tying arrangement. As such, Meehan contends, any putative violation of the variation program prescribed in provision 34b cannot lawfully be asserted as cause for termination of his franchise.

An illegal tying arrangement exists "when a seller, having a product which buyers want (the 'tying product'), refuses to sell it alone and insists that any buyer who wants it must also purchase another product (the 'tied product')." *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1329 (6th Cir. 1983) (citing *N. Pacific Ry. Co. v. U.S.*, 356 U.S. 1, 5-6 (1958); *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1126 (6th Cir.1981)). The anti-competitive problem with such an arrangement is that it lets "a seller to exploit[] his dominant position in one market to expand his empire into the next." *Times-Picayune Publ'g Co. v. U.S.*, 345 U.S. 594, 611 (1953).

Tying arrangements are generally per se illegal under § 1 of the Sherman Act, 15 U.S.C. § 1,[4] when they involve two distinct products or services and "a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Fortner Enter., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 499 (1969).[5] The Sixth Circuit also requires a plaintiff to allege "(1) the seller of the tying product has a direct economic interest in the sale of the tied product, and (2) the plaintiff has suffered an antitrust injury as a result of the tying arrangement." *CTUnify, Inc. v. Nortel Networks, Inc.*, 115 Fed. Appx. 831, 834 (6th Cir. 2004) (citations omitted).

Meehan asserts that Trane unlawfully used its control over franchise rights and its hold over the concomitant opportunity granted to Toledo Trane to procure and sell Trane-branded products to compel Toledo Trane to accept a "predatory program" which "*de facto* achieved the same result as if it had required Toledo Trane to purchase all Non-Trane-Branded Products through Trane."

---

[4]Section 1 of the Sherman Antitrust Act states in part that: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (2007).

[5]

I note that some authorities hold "[t]ying arrangements that constrain only dealers are not presumptively illegal because they pose little danger to competition, as long as consumers may purchase the two goods separately." *Ransomes Am. Corp. v. Spartan Distrib., Inc.*, 914 F. Supp. 183, 185 (W.D. Mich., 1996). While such arrangements may be illegal "they are not presumptively so, and it is incumbent upon the plaintiff, under 'the Rule of Reason,' to plead and show that the challenged arrangement has an 'actual adverse effect on competition.'" *Id.*

Given the direction of the Sixth Circuit on similar analyses of vertical non-price restraints, there is reason to believe that it would apply the rule of reason with regard to tying arrangements that constrain dealers. *Id.* Meehan presents enough evidence, however, that his tying allegations could succeed, even under the higher "rule of reason" standard. *Cf. CTUnify, Inc. v. Nortel Networks, Inc.*, 115 Fed. Appx. 831, 835 n.2 (6th Cir. 2004) ("In the past, this court has recognized that tying arrangements may be found to violate antitrust law either under a per-se or rule-of-reason analysis. These two theories of tying analysis, however, 'have, in effect, merged in recent years.'") (quoting *PSI Repair Servs., Inc. v. Honeywell, Inc.*, 104 F.3d 811, 815 n.2 (6th Cir. 1997)).

13

(Defs.' Ans. ¶ 117, Sept. 5, 2007). Rather than forcing him and other franchisees to buy a particular product they did not want to purchase, Meehan asserts that Trane's power over Trane-branded products (the tying products) forced retailers to purchase certain non-Trane-Branded products (the tied products) "on Trane's terms when Toledo Trane would rather have purchased them on other terms." (Defs.' Ans. ¶ 120.) The non-Trane-branded products were sold as part of Toledo Trane's bundled sales, which combined Trane-branded products, non-Trane branded products, and services in a comprehensive HVAC system.

Trane imposed the "variation program" on already existing franchise relationships. Given the power dynamic between franchisors and franchisees, courts have often found that such *ex post* tying arrangements satisfy the economic power requirement for a violation of § 1. *See* 22 Am. Jur. Proof of Facts 2d 267 *Franchise Tying - Market Power* § 6 (West 2007) (citing *Tire Sales Corp. v. Cities Serv. Oil Corp.* 410 F. Supp. 1222 (N.D. Ill. 1976); *Warriner Hermetics, Inc. v. Copeland Refrigeration Corp.* 463 F.2d 1002 (5th Cir. 1972)). *But see Kingsport Motors, Inc. v. Chrysler Motors Corp.*, 644 F.2d 566, 571 (6th Cir. 1981) (finding no proof that Chrysler possessed sufficient economic power over the dealership plaintiff).

While this may not be, as Meehan admits, a typical or "classic tying arrangement," the alleged operation and effects could well be clear enough to a jury: it could find that Trane has the requisite economic power over its own brand and a direct economic interest in its sales of non-Trane-brand products to its franchisees.

In light of Meehan's contention that the variation program led to anti-trust injuries: i.e., reduced profit margins for Toledo Trane and increased prices for its customers, he appears to meet the requirements of *Fortner Enterprises*, the more recent *Eastman Kodak Co. v. Image Technical*

14

*Servs., Inc.*, 504 U.S. 451 (1992), and Sixth Circuit case law. This is so, despite the fact that the anti-competitive result arises from the complicated operation of MOPP 34b. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984) ("[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, *or might have preferred to purchase elsewhere on different terms*.") (emphasis added) (quoted in *Eastman Kodak, supra*, 504 U.S. at 464 n.9).

Trane may be able to muster factual allegations that justify or explain the regulations contained in MOPP 34b.  Nonetheless, on the record I have before me, I conclude that Meehan has stated a potentially persuasive, albeit somewhat novel, anti-trust claim.

### (b). Enforcing an Illegal Contract

For the purposes of his request for a temporary restraining order Meehan uses his anti-trust claim as a shield rather than a sword. Instead of contradicting Trane's claim that he violated the MOPP and defrauded Trane, Meehan claims that Trane cannot assert an unlawful contractual provision as lawful cause for terminating his franchise.

Federal courts will not enforce a contract that violates the Sherman Act when doing so would bring about "the precise conduct made unlawful by the Act." *Kelly v. Kosuga*, 358 U.S. 516, 520 (1959); *see also, e.g.*, *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77-84 (1982) (holding that if clauses of an employment contract make the contract illegal under the Sherman Act, a suit to enforce such clauses is subject to the defense of illegality).

Meehan's claim is both similar, different and somewhat unique: he contends that allowing his putative violation of Trane's illegal contract to act as cause to terminate his franchise would be

15

the same as [and as unlawful as] enforcing an illegal contract. *See Earley Ford Tractor, Inc. v. Hesston Corp.*, 556 F. Supp. 544 (W.D. Mo. 1983) (temporarily enjoining termination of a dealership contract when the reason for termination implicated efforts to engage in a tying arrangement in violation of the Sherman Act); *see also Ransomes Am. Corp. v. Spartan Distribs., Inc.*, 914 F. Supp. 183, 184 (W.D. Mich. 1996) (rejecting defendant's claim that a Michigan statute requiring cause for termination of a contract applied and thus not reaching defendant's claim that cited cause was premised on an agreement in violation of the Sherman Act).

I am persuaded that such a contention is, in the abstract, potentially viable. But it is far from clear that upholding Meehan's alleged fraud as cause for termination would necessarily serve to enforce "precise conduct made unlawful" by the Sherman Act. *Kelly*, *supra*, 538 U.S. at 520. In its letter terminating the relationship, Trane cited Meehan's "pervasive pattern of deception" and the fact that "the deceit continued" when Trane made Meehan aware of its audit findings. (Defs.' Mem. in Supp. of Mot., Ex. C, Sept. 5, 2007.)

Neither of these explanations may, moreover, arise solely from Meehan's putative violation of MOPP 34b; if they do not, the Sherman Act would not appear to be in play. Certainly if alleged fraud or improper gain resulted from conduct unrelated to provision 34b, any anti-trust issue contained within that provision would be moot.

At this point, and based on the record before me, all I can say is that Meehan may have a viable anti-trust claim that survives the loss of his franchise. But the likelihood that that claim will overcome all aspects of Trane's cited cause for termination of his franchise is not presently so well established that that claim would compel issuance of injunctive relief, even if Meehan had shown

16

a likelihood of success vis-a-vis his claim of modification or estoppel regarding of the underlying franchise agreement.

Meehan fails, therefore, to clear the second hurdle in his path to injunctive relief; even if cause were required, he has not shown a substantial likelihood that his anti-trust claim can completely rebut Trane's assertions of cause for terminating his franchise.

### B. Irreparable Injury

Meehan argues that the termination of his Trane franchise would irreparably damage his business by harming its goodwill from an established Trane customer base and necessitating the termination of many specially trained employees. Further, Meehan argues that Trane will not be injured by Toledo Trane's continued operation as a Trane dealer during the pendency of the litigation.

### 1. Loss of Goodwill

Meehan claims that Toledo Trane faces injury to its goodwill and reputation. Noting that the Sixth Circuit and lower federal courts in Ohio recognize the loss of goodwill as sufficient to constitute irreparable injury, Meehan cites *Basicomputer Corp. v. Scott*, 973 F.2d 507 (6th Cir.1992) (affirming the district court's decision to issue the preliminary injunction and noting "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute") and *D.J. Miller & Associates, Inc. v. Ohio Dept. of Admin. Servs.*, 115 F. Supp. 2d 872 (S.D. Ohio 2000) (determining that loss of goodwill and damage to business' "good name" constituted irreparable injury and granting plaintiff's motion for a preliminary injunction).

17

The decision in *Beaute Craft Supply Co. v. Revlon, Inc.*, 402 F.Supp. 385 (E.D.Mich. 1975) best represents Meehan's proposition that Toledo Trane will suffer irreparable harm through loss of years of goodwill resulting from their investment of money, time and effort in the business. In *Beaute*, the plaintiff sold cosmetics and entered into a franchise agreement with Revlon to sell Revlon products. Revlon terminated the agreement when the plaintiff began selling a competitor's products. In granting the plaintiff's motion for a preliminary injunction, which required Revlon to continue to do business with the plaintiff, the court found that termination of the franchise agreement caused irreparable harm to the plaintiff. *Id.* at 388. Sale of Revlon products amounted to 20% to 25% of the plaintiff's sales volume and no harm would be done to Revlon in granting the preliminary injunction. *Id.* Accordingly, loss of goodwill is appropriate to consider when determining irreparable injury.

### 2. Additional Resulting Harm

Meehan has been operating a Trane franchise since 1971. He has invested considerable money, time and effort and has established goodwill for both himself and Trane. If the franchise is terminated, Meehan will need to discharge employees, sell inventory, terminate contracts and face payments for defaulted promissory notes.

Trane contends that Meehan will not be irreparably harmed during the duration of the lawsuit. It suggests that Meehan: will be able to continue operations [though limited in scope and less lucrative]; has other components of his business that will not be adversely affected; and has failed to demonstrate harm that cannot be compensated through money damages.

Although Meehan operates "a full-service, comprehensive, commercial HVAC sales company with representative or dealer agreements with companies other than Trane and with a

18

service company," Meehan Aff. at ¶ 3, the business consists primarily of sales of new commercial HVAC systems (all Trane units), sales of controls (90% Trane equipment), sales of Trane parts and a service business (roughly one third of Toledo Trane's revenue). The losses, though somewhat difficult to calculate precisely, would be substantial. But those losses are compensable.

However, Meehan would suffer loss of customer goodwill. This could not readily be recouped and is mostly non-compensable. That, plus the more compelling prospect of the loss of livelihood on the part of Meehan's employees, tips the balance on the issue of irreparable harm in Meehan's favor.

### C. Harm to Others

The next element is whether issuance of a TRO would cause substantial harm to others. I have already discussed the harm that Meehan would suffer in the absence of an injunction. Therefore, I now turn to the harm that Trane might suffer as a result of an injunction.

Trane contends that it has an absolute reason and an absolute right to end the relationship with Meehan, and, accordingly, can terminate the franchise contract. Particularly, Trane claims that it would be harmed by being forced to continue a relationship with someone whose integrity it doubts, and in whom it has lost trust, faith and confidence.

Forcing it to keep Meehan as a franchisee would, according to Trane, also cause it harm because such would "place its reputation in the hands of another with whom [it] asserted it no longer had or desired to have a contractual relationship." (Pl.'s Opp'n to Defs.' Mot. for T.R.O., p. 11 (quoting *Hacienda Mexican Restaurant of Kalamzoo Corp. v. Hacienda Franchise Group, Inc.*, 569 N.E.2d 661, 669-70 (Ind. Ct. App. 1991)).) Trane alleges that its reputation, customers, money and name are at risk if compelled to continue its relationship with Meehan. Trane also asserts that losses

19

will result because it has already obtained commercial premises and retained employees in anticipation of opening its new Toledo outlet.

Any damages resulting from postponement of the start-up of Trane's own operations in Toledo are compensable, and thus not irreparable. Its concerns about possible loss of reputation if Meehan continues to be its representative while this suit is pending are speculative. Meehan, who wants to restore the relationship and keep going as a Trane outlet, has every incentive to protect Trane's reputation and standing in the community. To do otherwise would diminish the benefits of succeeding in this litigation.[6]

Finally, while Trane might find it uncomfortable to continue to work with someone whom it does not trust, that is not a basis for a finding of irreparable harm. Mature businesses and adult businessmen often deal with those whom they do not like or trust. Forcing Trane to do so is not that remarkable. I recognize that Trane may suffer some monetary losses if I issue a restraining order, but it will not be faced with financial ruin. Moreover, while injunctive relief might impose some hardship, the harm to Meehan and his business and employees substantially outweighs any harm to Trane.

### D. Public Interest

The fourth element is whether the issuance of a preliminary injunction would impact the public interest.

There are public interest arguments in favor of both sides of the dispute. Public policy favors continuation of a local business that has existed for thirty-six years and the business' continuation

---

[6]

I note that since Trane notified Meehan of how it expects Toledo Trane to comply with MOPP 34b, Toledo Trane has been complying and business has been continuing without significant interruption.

in providing HVAC sales and services to the community. Public interest also favors protection of a franchisee who has invested time and money into the operation of a franchise. These considerations suggest that Meehan should be granted injunctive relief. Alternatively, public interest favors parties to honor contractual agreements, and this consideration suggests that the injunctive relief should be denied.

### E. Balancing of Factors

Although failure to issue injunctive relief will cause substantial harm to Meehan, some of that harm is compensable. But the harm to Trane is fairly modest in comparison to what's irreparable from Meehan's perspective: a potentially significant contraction of his business and reduction in his workforce. While the loss of business might be compensable in part, it might also be irreparable in part: customers, once lost, often are lost forever. Thus, the balance of harms favors granting injunctive relief to Meehan.

But that does not overcome the fact that Meehan has very little likelihood of success on his claim that Trane agreed to modify the contract. That likelihood is so slim and slight, in my view, that issuance of injunctive relief would serve no useful or lawful purpose. It would, at most, cause some delay. But it would not provide or pave the way for long term results.

The fact that Meehan may have a viable anti-trust claim does not justify issuance of injunctive relief in his favor. That claim, if successful, may lead someday to substantial damages. But equity does not concern itself with the recovery of damages. Whatever the merits of the anti-trust claim – which does not depend on whether the contract required termination only for cause – that claim is not a basis for injunctive relief.

### Conclusion

21

For the foregoing reasons, it is hereby

ORDERED THAT the defendant Robert J. Meehan, Jr.'s motion for a temporary restraining

order and preliminary injunction be, and is the same hereby, denied.

So ordered.

s/James G. Carr

James G. Carr

Chief Judge