IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Trane U.S. Inc.,                                    Case No. 3:07CV02377

         Plaintiff,

     v.                                             ORDER

Robert J. Meehan, Jr. et al.,

         Defendants.


In this dispute, plaintiff Trane U.S. Inc. ("Trane"), a manufacturer of heating, ventilating,

and air conditioning ("HVAC") systems, claims that defendant Robert J. Meehan and his Trane

franchise, Toledo Services, Inc. (collectively "Toledo Trane") of Toledo, Ohio, fraudulently failed

to account for monies Toledo Trane owed to plaintiff. In addition to bringing the instant suit, Trane

terminated its franchise agreement with Toledo Trane, providing thirty days notice as required by

the agreement. Toledo Trane responded with several counterclaims, among them that certain

guidelines on which plaintiff bases its fraud claims violate the Sherman Antitrust Act, 15 U.S.C. §

1, and the Clayton Act, 15 U.S.C. § 14. Jurisdiction is proper under to 28 U.S.C. § § 1332, 1337(a),

and 1367(a).

Trane now moves to dismiss six of defendant's counterclaims. (Doc. 46). The first four

counterclaims relate to violations of federal antitrust laws: 1) a product tying violation of Sherman

Act § 1 and Clayton Act § 3 (Count One); 2) a brand tying violation of Sherman Act § 1 (Count

Two); 3) a resale price maintenance violation of Sherman Act § 1 and Clayton Act § 3 (Count Three); and 4) a horizontal restraint violation of Sherman Act § 1 and Clayton Act § 3 (Count Four). The remaining two counterclaims allege violations of state laws, namely, the Ohio Valentine Act (Count Five) and the covenant of good faith (Count Eleven).

For the following reasons, I grant the motion for dismissal with the exception of the defendant's counterclaim for breach of the covenant of good faith.

## Background

In 1959, Meehan began working as a salesman for Trane. Thirteen years later, he expressed an interest in opening an independent Trane franchise center. After a series of meetings, Trane offered Meehan an opportunity to establish a franchise in Toledo. Meehan accepted the offer and signed a franchise agreement.

The franchise agreement included two provisions pertinent to the current dispute. The first explained that either party could terminate the agreement on thirty days notice to the other party. The second stated that "no amendment, supplement or modification [of the contract] shall be of any force and effect unless it is signed in writing and signed by the party sought to be charged." (Doc. 11, Attach 1 at 5). The contract also provided that Wisconsin law governed all provisions.

Meehan alleges that when he began operating his franchise (after taking over from another franchisee), he found the business in dire circumstances. Realizing a substantial investment would be necessary to make Toledo Trane profitable, Meehan grew concerned about the thirty day termination clause. If Trane were to exercise the clause, Meehan feared he could lose his investment in the business. These concerns, Meehan alleges, caused him over the years to have several

conversations with various Trane managers; all, according to Meehan, indicated that Trane protected its franchisees and would not terminate a franchise without cause.

Toledo Trane grew and prospered. In addition to selling Trane products, Toledo Trane sold parts for other manufacturers and managed a separate service division. Toledo Trane's income came primarily from sales of: new commercial HVAC systems (consisting solely of Trane parts); controls (90% of which Trane produced); and other Trane manufactured parts. Toledo Trane's service division generated about one-third of its income.

In March, 1992, Trane issued a "Manual of Policies and Procedures" ("MOPP") for its franchisees. These policies largely affected "bundled sales," which are sales of products that combine Trane and non-Trane components.

Two sections of MOPP provision 34b (MOPP 34b) were of particular importance to these sales: 1) a requirement that all Trane franchises report sales of non-Trane products to Trane and pay Trane a percentage of those sales; and 2) a provision setting, through a complicated incentive structure, minimums on the sale price of all Trane products and maximums on the sale price of all non-Trane products.

Toledo Trane alleges that these provisions set the resale price for non-Trane products so as to maximize Trane's return on bundled sales. As a consequence, Toledo Trane's cost to sales increased and its profit margin decreased. This hurt competition, according to Toledo Trane, because a "break even price on any job is set higher than it would be set absent the extra-contractual predatory restrictions Trane has imposed in MOPP 34b." (Doc. 59 at 13).

In other words, Toledo Trane alleges that, as a result of the mandates of MOPP 34b, it had to enter the marketplace with higher prices to be profitable than it would have had the provisions not been in place.

In addition to serving as a franchisee for Trane, Toledo Trane is a sales representative for TAC, another maker of HVAC controls. At approximately the same time as Trane issued the MOPP, it also imposed new rules regarding sales of such controls. According to defendant, Trane "coerced Toledo Trane not to sell TAC units except in jobs where TAC [was] already installed." (*Id.* at 14). This policy, by forcing Toledo Trane to use Trane controls where TAC controls would be suitable and less expensive, raised Toledo Trane's market prices for HVAC system controls. Toledo Trane also alleges that the policy allowed Trane to inflate the price of products that compete with Trane-brand products.

Toledo Trane acquiesced in MOPP 34b and undertook to follow and implement the additional requirements. Meehan claims he had no other choice, as Trane could terminate Toledo Trane's franchise. Furthermore, given the time and money Meehan had invested in his business, the "cost of switching franchises would have far exceeded the incremental costs that Trane was assessing Toledo Trane and the other franchisees through MOPP 34b." (*Id.* at 9).

The events giving rise to this suit began when Trane audited Toledo Trane in June, 2005. Trane alleges the audit uncovered significant noncompliance with the MOPP by Toledo Trane and a resulting shortfall in payments to Trane of over $1,000,000. Trane thereon exercised the thirty day termination provision of the franchise agreement. In addition, it filed the instant suit seeking damages for the alleged fraud. Toledo Trane responded, in part, by filing its counterclaims.[1]

---

[1] Toledo Trane also sought to obtain a temporary restraining order to avoid termination of its

## Discussion

### A. Standard of Review

As with any motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, I deem all factual allegations in the complaint to be true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,   U.S.   , 127 S. Ct. 2499, 2509 (2007). When ruling on a Rule 12(b)(6) motion, a court must also construe the complaint in a light most favorable to the nonmoving party. *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir.1998).

The Supreme Court recently clarified this standard in *Bell Atlantic Corp. v. Twombly*,   U.S.   , 127 S. Ct. 1955 (2007). In *Twombly*, the Court considered the standard for dismissing a complaint filed under § 1 of the Sherman Act, explaining that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at   , 127 S. Ct. at 1964-65 (citations omitted). Though the complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* at   , 127 S. Ct. at 1965 (internal citations omitted); *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007); *Nicsand, Inc. v. 3M Co.*, 507 F.3d 442, 460 (6th Cir. 2007) (Martin, J., dissenting) (explaining that *Twombly* simply distinguished "between a bare-bones complaint asserting only the elements of a claim and a complaint asserting not only legal *elements*, but also *facts* to support those elements"). *But cf. Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 541 (6th Cir. 2007) (noting

---

franchise. After a period of delay, during which the parties sought unsuccessfully to resolve that part of their dispute, I overruled the motion for the temporary restraining order.

uncertainty about *Twombly*'s "reach beyond the antitrust context" (citing *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir.2007))).

### B. Antitrust Claims

Toledo Trane's antitrust counterclaims allege that, via several rules and policies, Trane violated § 1 of the Sherman Act, 15 U.S.C. § 1, and § 3 of the Clayton Act, 15 U.S.C. § 14.

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States  .  .  . is declared to be illegal." 15 U.S.C. § 1. In a more specific manner, § 3 of the Clayton Act prohibits commercial actors from selling or contracting for the sale of goods "on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods  .  .  . of a competitor" of the commercial actor, where the effect of such an arrangement "may be to substantially lessen competition or tend to create a monopoly in any line of commerce." 15 U.S.C. § 14.[2]

The Supreme Court has provided two methods of analysis for judging agreements that allegedly violate antitrust laws: "the first employs a presumption that an agreement is an antitrust violation, thus invoking a per se illegality rule to classify the agreement." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1088 (6th Cir.1996). The second analytical method, denominated the "rule of reason," "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Id.* (quoting *Ariz. v. Maricopa County Med. Soc'y*, 457 U.S. 332, 343 (1982)).

---

[2]

Though on their face these sections create only criminal penalties, § 4 of the Clayton Act, 15 U.S.C. § 15(a), provides treble damages relief to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."

Toledo Trane contends that Trane forced it to participate in: 1) a resale price maintenance scheme; 2) tying arrangements; and 3) horizontal restraints, in violation of the Sherman and Clayton Acts. Trane's motion to dismiss argues that Toledo Trane's federal antitrust allegations fail to state a claim and are barred by the applicable statute of limitations.[3]

### 1. Resale Price Maintenance Claim

Toledo Trane alleges that, through MOPP 34b, Trane has "de facto set a floor on the price at which Trane products can be sold and a ceiling at which non-Trane products can be resold," and thus engages in illegal resale price maintenance. (Countercls. at ¶¶ 70, 152).[4]

For a plaintiff to assert a cognizable resale price maintenance claim against a manufacturer, such as Trane, it must allege: "(1) the manufacturer has contracted, combined, or conspired (2) with a separate economic entity (3) to set the price at which the products are resold (4) in an independent commercial transaction with a subsequent purchaser." *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1222-23 (8th Cir. 1987).

Trane claims Toledo Trane's resale price maintenance counterclaim fails to satisfy these elements because: 1) by virtue of the agency relationship between Trane and Toledo Trane, the parties are not "separate economic entities" capable of "conspiring"; 2) Toledo Trane does not "resell" Trane products in an independent transaction; and 3) Trane does not set the price at which

---

[3]

Trane also rightly points out that the Valentine Act counterclaim (Count Five) succeeds or fails with its federal antitrust counterparts. *C.K. v. J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204-05 (1980). To the extent that I find defendant's federal antitrust counterclaims fail to state a claim, I also dismiss the Valentine Act counterclaim (see Section B. 4., *infra*).

[4]

Resale price maintenance does not constitute a per se violation of antitrust laws but must instead be assessed under the rule of reason. *Leegin Creative Leather Prods. v. PSKS, Inc.*,     U.S.    , 127 S. Ct. 2705, 2725 (2007).

the non-Trane ancillary products are resold.

### a. Resale Price Maintenance With Regard
### to Trane Products in Bundled Sales

Trane argues that it did not conspire with Toledo Trane to violate antitrust laws because §

1 of the Sherman Act only proscribes activity between separate economic entities. 15 U.S.C. § 1

(2007); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Section 1 of the

Sherman Act  .  .  .  reaches unreasonable restraints of trade effected by a 'contract, combination

 .  .  .  or conspiracy' between separate entities. It does not reach conduct that is 'wholly

unilateral.'").

According to Trane, when the parties engaged in bundled sales under MOPP 34b, Toledo

Trane was not a separate entity; rather, it was serving as an agent for Trane. Agents are incapable

of conspiring with their principals for purposes of § 1. *See, e.g.*, *Day v. Taylor*, 400 F.3d 1272, 1276

(11th Cir. 2005) (explaining that in agency relationships "there can be no combination and

conspiracy in restraint of trade, and hence no Sherman Act violation").

Citing *Simpson v. Union Oil Co.*, 377 U.S. 13 (1964), Toledo Trane argues that an agency

agreement cannot entirely preclude a finding of a Sherman Act conspiracy. A court must examine

"various substantive 'indicia of entrepreneur[ship]' and the allocation of business risks, rather than

the mere form of the agreement, in evaluating the economic substance of an agency or

consignment." *Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1223 (8th Cir. 1987) (quoting *Simpson*,

*supra*, 377 U.S. at 20).

In theory, this means that courts examine a number of elements, including "whether the agent

performs a function on behalf of his principal other than securing an offer from a buyer for the

principal's product; the degree to which the plaintiff is authorized to exercise his discretion

8

concerning the price and terms under which the principal's product is to be sold;" and " whether use of the agent constitutes a separate step in the vertical distribution of the principal's product. " *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025, 1031, n.5 (2d Cir. 1979).[5]

In practice, however, the analysis often focuses on which party "bears most or all of the risk on the transactions with purchasers."*Ryko*, 823 F.2d at 1223; *see also Day*, *supra*, 400 F.3d at 1277-78 (dismissing agent's antitrust claims because the principal bore numerous liabilities and responsibilities related to the agent's rental of U-Haul trucks); *Belfiore v. N.Y. Times Co.*, 826 F.2d 177, 182 (2d Cir. 1987) (noting that the district court's conclusion that wholesalers "do not bear the risk of loss for unsold [news]papers," while relevant, on its own could not support summary judgment ruling); *Ill. Corp. Travel v. Am. Airlines*, 806 F.2d 722, 725 (7th Cir. 1986) (examining risks assumed by travel operator versus risks assumed by airline).

Courts, however, appear to disagree as to how broadly to apply this analysis. Some focus on the transaction at issue. For example in *Ryko*, *supra*, 823 F.2d at 1223-24, the Eighth Circuit limited its conspiracy analysis to an examination of "the distributor's role vis-a-vis transactions allegedly involving an antitrust violation." *Id.* ("A distributor may act as his supplier's agent when performing certain duties in a business relationship, but as an independent entrepreneur when performing others."); *see also Day*, *supra*, 400 F.3d at 1278 (identifying the dealers as agents for the purposes of U-Haul rental, despite their other roles as "owners of gas stations, hardware stores, and other

---

[5]

Other courts acknowledge that the test is somewhat fluid. *See Morrison v. Murray Biscuit Co.*, 797 F.2d 1430, 1438 (7th Cir. 1986) ("No hard and fast line, therefore, can be drawn between the mere sales agent and the dealer or distributor, for these terms denote points, by no means fixed, on a continuum bounded at one end by the manufacturer's full-time employees and at the other by vast, autonomous distribution enterprises such as Sears Roebuck.").

similar businesses"); *Hardwick*, *supra*, 589 F.2d 806, 809-10 (holding that "with respect to the sale of gasoline" and "for the purposes of antitrust law," plaintiff was an employee of defendant).

Other courts insist "that proper inquiry into capacity to conspire requires a thorough application of the *Fuchs* principles to the facts, including the number and nature of the agent's functions." *Belfiore*, 826 F.2d 177, 182 (2d Cir. 1987); *cf. Fuchs Sugars*, *supra*, 602 F.2d at 1031, n.5 (including, among the elements a court must analyze, "whether the agent performs a function on behalf of his principal other than securing an offer from a buyer").

Both parties in this case cite *Pink Supply Corp. v. Herbert, Inc.*, 788 F.2d 1313 (8th Cir. 1986), as support for their arguments.

In *Pink Supply*, a dealer of office supply furniture brought a Sherman Act suit against Hiebert, a furniture manufacturer, and its sales representatives for conspiring to fix prices. In holding that the representatives were merely agents of the manufacturer, the Eighth Circuit pointed out that the representatives "did not stock furniture for resale, sell Hiebert furniture, arrange shipment or install or service merchandise." *Id.* at 1316.

Trane highlights the fact that, like Toledo Trane, Hiebert's agents "were commissioned sales representatives merely soliciting orders for and arranging sales of their principal's furniture." (Doc. 47 at 8). There are important distinctions, however, between Toledo Trane's relations with Trane and Hiebert's interactions with its sale representatives. Unlike the Hiebert and its representatives, Toledo Trane did not "function as an integral part of the [Trane] corporate entity," was not "functionally indistinguishable from [Trane's] employees" and did not "lack . . . independent economic consciousness." *Pink Supply Corp.*, *supra*, 788 F.2d at 1316.[6]

---

[6]

I also note that the court's commentary in *Pink Supply* on this issue is dicta because the court limited

Given the complex relationship evident in this case I am not prepared to conclude that Toledo Trane could not be a separate economic entity capable of conspiring with Trane. Even if I limit the issue to an isolated analysis of the bundled sales, Toledo Trane argues that Trane's direct billing did not reflect the underlying economic reality of the transaction. With regard to the overall relationship between the parties, it is clear that Toledo Trane's relationship with Trane is broader and more complex than the convenience store owner and gas supplier in *Hardwick*, *supra*, 589 F.2d 806; the truck dealers and the U-Haul corporation in *Day*, *supra*, 400 F.3d 1272; and the furniture manufacturer and its sales representatives and *Pink Supply Corp.*, *supra*, 788 F.2d 1313.

But this does not mean that Toledo Trane can survive the motion to dismiss its claim of illegal resale price maintenance with regard to the bundled sales. Its counter-complaint fails to make the requisite showing of *resale* – the fourth element of a resale price maintenance claim.[7] Toledo Trane concedes that, with regard to bundled sales, "Trane would bill the customer." (Doc. 59 at 25). Thus, as in *Ozark Heartland Elecs., Inc. v. Radio Shack*, 278 F.3d 759, 763 (8th Cir. 2002), Toledo Trane, as the franchisee, "neither bought nor resold" the merchandise in question. *See also Ill. Corp. Travel, Inc.*, *supra*, 806 F.2d at 725 ("Travel service operators do not resell air travel").

---

Pink Supply's appeal to two claims of error: 1) "that the evidence sufficiently raised an issue of fact regarding whether the representatives were acting for their own benefit in recommending appellant's termination as a Hiebert dealer" and 2) "that *Albrect v. Herald Co.*, 390 U.S. 145, 150 (1968) and *Int'l Travel Arrangers, Inc., v. W. Airlines, Inc.*, 623 F.2d 1255, 1266 (8th Cir.) authorize a finding of conspiracy between a corporation and its agents if the agents are aware of the anticompetitive purpose for which they are being used." *Pink Supply Corp. v. Hiebert, Inc.*, 788 F. 2d 1313, 1317-18 (8th Cir. 1986) (internal citations omitted).

[7]

Like the Eight Circuit in *Ozark Heartland Elecs., Inc., v. Radio Shack*, 278 F.3d 759, 763 (8th Cir. 2002), I "find it more straightforward to approach this case under *Ryko*'s fourth element – whether the antitrust plaintiff engaged in an independent transaction with a subsequent purchaser."

Trane's concession undermines any argument that the bundled sales amounted to an "independent commercial transaction." *Ryko Mfg.*, *supra*, 823 F.2d at 1223. For this reason, I dismiss the defendant's resale price maintenance counterclaim in Count Three insofar as it relates to the Trane product portion of bundled sales.

### b. Resale Price Maintenance With Regard to Non-Trane Ancillary Products in Bundled Sales

Toledo Trane makes similar allegations regarding non-Trane products as it made regarding Trane products. As to non-Trane products Trane is not, however, an agent. It is, moreover, reselling the ancillary parts of the bundled sale. With regard to these non-Trane items, Toledo Trane alleges that Trane used the pricing data designed for Trane's products (specifically the "List Price Cost Point Adjustment Factor" and the "Multiplier (entered)") to dictate the allowable markup on non-Trane products.[8] *Cf. Ill. Corp. Travel, Inc.*, *supra*, 806 F.2d at 727 (explaining that American Airlines stopped trying to enforce direct pricing rules on travel agents because agents could "sell a package of air travel and hotel space at a bargain, claiming that they had collected the full commission on the air travel but rebated the commission on the hotel room"). According to Toledo Trane, this set a price ceiling on non-Trane products.

Without citing any caselaw, Trane argues that it did not "dictate and control the terms of the sale of non-Trane, ancillary products to the customers" because "MOPP 34b simply concerns

---

[8]

The "List Price Cost Point Adjustment Factor" (LP CPAF) dictates the potential markdown franchisees may apply to Trane equipment. The "Multiplier (entered)" is a number that ranges from .358 to .396, that is multiplied by the "List Price" to arrive at the "Selling Price." (When there is a list price cost point adjustment, the "Selling Price" is the product of the "List Price" times the "Multiplier (entered)" times the "LP CPAF".)

internal profit allocation." (Doc. 47 at 10). It points out that the Toledo Trane can only argue that MOPP 34b *de facto* "limits Toledo Trane's mark-up of the non-Trane equipment." (Doc. 59 at 27).

I see no reason why this allegation – *de facto* or otherwise – fails to state a claim. Defendant's argument may not amount to an allegation that MOPP 34b directly and openly sets the prices on non-Trane ancillary products. Readily palpable and perceptible violations of antitrust laws are rare.

I conclude that Count Three states a cause of action with regard to the claim of a resale price maintenance violation vis-a-vis the non-Trane ancillary product portion of the bundled sales.[9]

## 2. Tying Claims

An illegal tying arrangement exists "when a seller, having a product which buyers want (the 'tying product'), refuses to sell it alone and insists that any buyer who wants it must also purchase another product (the 'tied product')." *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1329 (6th Cir.1983) (citing *N. Pacific Ry. Co. v. U.S.*, 356 U.S. 1, 5-6 (1958); *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123, 1126 (6th Cir.1981)). The anti-competitive problem with such an arrangement is that it allows "a seller [to] exploit[ ] his dominant position in one market to expand his empire into the next." *Times-Picayune Publ'g Co. v. U.S.*, 345 U.S. 594, 611 (1953).

Tying arrangements are generally illegal under § 1 of the Sherman Act, 15 U.S.C. § 1, when they involve two distinct products or services and "a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Fortner Enters., Inc. v. U.S.*

---

[9] However, as discussed below, Trane failed to bring this claim within the four year statute of limitations. The claim of illegality regarding resale price maintenance of non-Trane ancillary products in bundled sales shall, accordingly, be dismissed as well.

13

*Steel Corp.*, 394 U.S. 495, 499 (1969).[10] The Sixth Circuit also requires a plaintiff allege "(1) the seller of the tying product has a direct economic interest in the sale of the tied product, and (2) the plaintiff has suffered an antitrust injury as a result of the tying arrangement." *CTUnify, Inc. v. Nortel Networks, Inc.*, 115 Fed. Appx. 831, 834 (6th Cir.2004) (citations omitted) (unpublished disposition).

Defendant asserts Trane unlawfully used its control over franchise rights, and its hold over the concomitant opportunity granted to Toledo Trane to procure and sell Trane-branded products, to compel Toledo Trane to accept a "predatory program," which "*de facto* achieved the same result as if it had required Toledo Trane to purchase all Non-Trane-Branded Products through Trane." (Countercls. at ¶ 117). Rather than forcing Toledo Trane and other franchisees to buy a product they did not want to purchase, Trane, according to Toledo Trane, used its power over Trane-branded products (the tying products) to force purchases of certain non-Trane-Branded products (the tied products) "on Trane's terms when Toledo Trane would rather have purchased them on different

---

[10]

Past decisions applied the per se rule to tying arrangements. If the defendant had "sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce [was] affected," the tie was illegal. *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 499 (1969).

Recent Sixth Circuit decisions have altered this analysis, requiring a deeper examination of the transaction in question. *See, e.g.*, *Beard. v. Parkview Hosp.*, 912 F.2d 138, 140 (6th Cir. 1990) (describing a tie as per se unlawful "when the seller has such power in the tying product or service market that the 'existence of forcing is probable' and there is 'a substantial potential for impact on competition'"; otherwise the court should apply the rule of reason); *Ransomes Am. Corp. v. Spartan Distribs., Inc*., 914 F. Supp. 183, 185 (W.D. Mich. 1996) (tying arrangement that affects only dealers is not presumptively illegal and is subject to the rule of reason). This has led the Sixth Circuit to describe its framework as a merger of the per se and rule of reason theories. *PSI Repair Servs. Inc., Honeywell, Inc.*, 104 F.3d 811, 815, n.2 (6th Cir. 1997) ("[T]hese two theories have, in effect, merged in recent years.").

terms." (Countercls. at ¶ 120). Toledo Trane sold the non-Trane-branded products as part of the aforementioned bundled sales.

Trane claims Toledo Trane has failed to plead a tying arrangement because Toledo Trane has not pled: 1) the existence of a tying arrangement; 2) the alleged arrangement resulted in any anticompetitive effect in the tied market; 3) a "reasonably cognizable market over which Trane has market power." (Doc. 47 at 12).

### a. Existence of a Tying Arrangement and Market Definition

Pointing to the basic requirements of a tying arrangement, Trane alleges that it does not: 1) "sell" Trane products or the Trane brand to Toledo Trane or 2) dictate "any aspect of the *purchase* of the tied products." (Doc. 47 at 12).

Trane's "no sale" argument parallels Trane's resale price maintenance defense. Replicated here, the argument is not as persuasive. In Count One, Toledo Trane only claims that Trane conditioned "access" to Trane-branded products on MOPP compliance. A sale is not directly implicated at this stage

I am not willing to dismiss Count One, therefore, simply on the basis of Trane's "no sale" argument.[11]

---

[11]

Past manufacturer-dealer cases appear to have involved actual sales rather than access arrangements. *See Ransomes Am. Corp. v. Spartan Distribs. Inc.*, 914 F. Supp. 183, 184 (W.D. Mich. 1996) (explaining that defendant manufacturer RAC, required dealer to "*purchase* [defendant's] mowers in order to be able to purchase other RAC products" (emphasis added)); *Strawflower Electronics, Inc. v. RadioShack Corp.*, 2005 WL 2290314, at *1 (N.D. Cal.) (contract required franchise to purchase a minimum amount of products from franchisor). Yet other cases indicate that a traditional "sale" is not required for tying products. *See Valley Products Co., Inc. v. Landmark*, 128 F.3d 398, 401 (6th Cir. 1997) (dismissing allegations that franchisor tied sales of logoed amenities to franchise rights because of lack of antitrust injury).

15

The same is true with regard to the second tying claim in Count Two, which alleges that the Trane brand – rather than Trane-branded products – is the tying product. Toledo Trane defines the Trane brand as "the bundle of intellectual property rights that Trane licensed to Toledo Trane in the Franchise Agreement." (Countercls. at ¶ 137). Despite its abstract form, Toledo Trane arguably "purchased" this "product" from Trane.

The existence of a tying arrangement involving the Trane brand is inherently related to Trane's disagreements with Toledo Trane's market definitions. Trane requests that I reject Toledo Trane's efforts to "label the Trane Brand as a 'tying product' that has a 'market' over which Trane has 'market power'" and instead hold that "use of the Trane Brand is not a legally cognizable market for antitrust purposes." (Doc. 47 at 16).

Toledo Trane's claim that the Trane brand is both a product and a market derives from the Supreme Court's decision in *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992). In that case, Kodak prevented independent service operators (ISOs) from repairing Kodak copiers sold to third parties. The company achieved this result by preventing ISOs from obtaining necessary replacement parts and only selling replacement parts to buyers who used Kodak services or repaired their own machines. *Id.* at 456-58.

Despite Kodak's lack of market power in the primary equipment market (i.e. the copier market), the Court refused to grant summary judgment to Kodak on the ISO's claims that Kodak illegally tied the sale of services to the sale of parts. *Id.* at 479. Kodak's claims that competition in the copier market prevented it from exercising "appreciable economic power" in the derivative aftermarket for parts fell on deaf ears. *Id.* at 464-77. Information costs and the "lock-in" effect

among consumer who had already purchased Kodak equipment – and therefore could not afford to switch machines – undermined Kodak's argument. *Id.* at 474-77.

The same theories of information costs, primary versus secondary markets, and parties that are "locked-in," also apply to the relationship between franchisors and a franchisees. *See generally*, *Wilson v. Mobil Oil Corp.*, 940 F. Supp. 944, 952-53 (E.D. La. 1996) (comparing franchisees to Kodak equipment owners); *Strawflower Electronics, Inc. v. RadioShack Corp.*, 2005 WL 2290314, at *7 (N.D. Cal.) ("[A]llegation that Radioshack conditioned [franchise's] access to RadioShack-branded products on its purchase of non-RadioShack branded products raises a classic tying claim").

Nonetheless, several precedents support Trane's argument for dismissal and lead to that result.

In *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997), the Third Circuit rejected the plaintiff-franchisees' claims that Domino's "imposed an unlawful tying arrangement by requiring franchisees to buy ingredients and supplies 'as a condition of their continued enjoyment of rights and services under their Standard Franchise Agreement.'" *Id.* at 436. Distinguishing *Queen City Pizza* from *Kodak*, the court pointed out that the services and parts for the copiers were unique, raising questions about reasonable interchangeability with other products (i.e. cross elasticity of demand).[12] *Id.* at 439-40. In contrast, Domino's ingredients were fully interchangeable with other pizza ingredients. Contractual restraints – rather than the market –

---

[12]

This is not entirely accurate as the ISOs in Kodak served as strong evidence that the services Kodak provided were not unique. *See Kodak*, *supra*, 504 U.S. at 457 ("Some customers found that the ISO service was of higher quality [than Kodak's].").

prevented the *Domino*'s plaintiffs from benefitting from this interchangeability.[13] *Id.* at 438 ("[T]he relevant inquiry here is not whether a Domino's franchisee may reasonably use both approved or non-approved products interchangeably without triggering liability for breach of contract, but whether pizza makers in general might use such products interchangeably.").

While other courts have followed the Third Circuit in refusing to recognize the "lock-in" effect of contractual arrangements (such as franchising agreements), the Sixth Circuit is not among them.[14] *See, e.g.*, *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1222 (11th Cir. 2002)

---

[13]

The court also pointed out that in contrast to the third party buyers in *Kodak* – and the defendant in this case – the franchisees in *Queen City Pizza* knew about the purchasing requirements before becoming "locked in" by the franchise contract. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 440 (3d Cir. 1997) ("The *Kodak* case arose out of concerns about unilateral changes in Kodak's parts and repairs policies  .  .  .  . In contrast, plaintiffs here knew that Domino's Pizza retained significant power over their ability to purchase cheaper supplies from alternative sources because that authority was spelled out in detail in section 12.2 of the standard franchise agreement.").

[14]

Plaintiff points out that in *Valley Products Co., Inc. v. Landmark*, 128 F.3d 398, 405 (6th Cir. 1997), the Sixth Circuit stated its "basic agreement" with the Third Circuit's approach in *Domino*'s. The plaintiff's citation to *Valley Products*, however, is misleading. Rather than adopting the Third Circuit's market analysis, *Valley Products* focused on trademark abuse and franchisor Landmark's requirement that franchisees purchase logoed amenities. *Id.* at 401. In the case, plaintiff Valley Products Co. wanted to sell soaps to franchised lodging facilities but the franchisor revoked Valley Products' right to manufacture or sell items "bearing logos owned or licensed by [the franchisor] or its affiliates." *Id.* Due to the alleged tie, franchisee lodging facilities could no longer purchase soaps from the plaintiff.

Despite the fact that *Queen City Pizza* "rested its decision on relevant market considerations, without expressly addressing the issue of 'trademark abuse,'" the court in *Valley Products* did not believe that the Third Circuit could have reached its result had it thought "that Domino's  .  .  .  was guilty of trademark abuse." *Id.* at 405. Therefore, the Sixth Circuit only agreed with the Third Circuit to the extent that the Third Circuit held that Domino's did not commit trademark abuse by requiring a franchisee to buy its specific ingredients and supplies as a condition of its continued enjoyment franchise rights. *Id.*

This means that *Valley Products* did not reject franchise rights as tying products or appropriate

("[D]istrict court correctly distinguished between contract power and market power."); *United Farmers Agent Ass'n, Inc. v. Farmers Ins. Exch.*, 89 F.3d 233, 236-37 (5th Cir. 1996) ("Economic power derived from contractual agreements such as franchises or in this case, the agents' contract with Farmers, 'has nothing to do with market power, ultimate consumers' welfare, or antitrust.'" (citation omitted)). In fact, at least one other court in this circuit explicitly recognized that franchise agreements *can* create markets in which the franchisor has market power. *Little Caesar Enters., Inc. v. Smith*, 34 F. Supp. 2d 513, 519 (E.D. Mich. 1998) (explaining that if the franchisor had not disclosed relevant policies at the time of signing the franchise agreement, the franchisees would have been "locked in," meaning plaintiffs "could assert a *Kodak*-type market for the tying product"); *Ransomes*, *supra*, 914 F. Supp. 183, 185 (indicating the tying arrangements constraining dealers can be illegal); *cf. Tarrant Serv. Agency, Inc. v. Am. Standard, Inc.*, 12 F.3d 609, 614 (6th Cir. 1993) ("Clearly, one brand of a product can constitute the relevant market when the product is unique and no reasonable substitutes exist"); *Virtual Maint., Inc., supra*, 11 F.3d at 666-67 (case remanded per *Kodak* when defendant company – which Ford awarded an exclusive right to distribute software to design companies – tied hardware maintenance to the sale of software).

There are some distinctions between parties "locked-in" by purchase of a product and parties "locked-in" by ratification of a franchise agreement. *See, e.g.*, *Maris Distrib. Co.*, *supra*, 302 F.3d at 1222-23. Given the power dynamic between franchisors and franchisees, however, I am not convinced that these differences warrant different treatment under antitrust laws. *See generally* 22

---

markets. Rather, it rejected the argument that requiring franchisees to purchase logoed products is "trademark abuse." *Id.* In contrast, the defendant in this case alleges that Trane conditioned the enjoyment of the Trane brand, and related franchise rights, on Toledo Trane's compliance with MOPP 34b, not the purchase of logoed items.

Am. Jur. Proof of Facts 2d 267 *Franchise Tying–Market Power* § 6 (West 2007) ("[A] number of courts have been willing to find the market power element satisfied by the franchisor's dominant position in relation to its franchisees, particularly where the tie has been accepted by all franchisees."). In any case, I need not decide this issue given my determination that Toledo Trane's tying claim can be dismissed on other grounds..

### b. Trane's Interest and Impact in the Tied Market

As discussed in this subsection, I conclude that Toledo Trane's failure to allege Trane's: 1) ability to "appreciably restrain free competition in the market for" non-Trane ancillary parts and 2) "direct economic interest in the sale" of non-Trane ancillary parts, is fatal to both its brand and product tying claims. *Fortner Enter.*, *supra*, 394 U.S. at 499; *CTUnify*, *supra*, 115 Fed. Appx. at 834 (unpublished).

Like many aspects of antitrust law, the requirement that a plaintiff allege the defendant had "sufficient economic power in the tying market to appreciably restrain competition in the tied product market" has evolved over time. *Fortner Enter.*, *supra*, 394 U.S. at 499; *Bell*, *supra*, 660 F.2d at 1127. Past interpretations merely required a showing of sufficient power in the market for the tying product. *See, e.g.*, *Kodak*, *supra*, 504 U.S. 451, 464 (1992) (focusing on whether defendants have "appreciable economic power in the tying market"); *Bell*, *supra*, 660 F.2d at 1127 (focusing the plaintiff's power to raise price or impose other burdens on buyers in the tying product's market). Recently, however, the focus has shifted. Combining the "sufficient power" element with the requirement that plaintiffs plead an antitrust injury, courts now require claimants allege that the tying agreement has an anticompetitive effect on the tied product's market. *CTUnify*, *supra*, 115 Fed. Appx. at 834-36 (unpublished); *see also Valley Prods.*, *supra*, 128 F.3d at 403 ("Among the

20

factors that we must examine in determining whether antitrust injury exists is 'the directness or indirectness of the asserted injury'" (quoting *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 540 (1983))); *Ransomes*, *supra*, 914 F. Supp. at 185 (holding that a "bald, conclusory allegation" that tying arrangement adversely affects competition does not withstand 12(b)(6) scrutiny).

In a similar manner, the "appreciably restrain competition" element has also evolved into a requirement that the alleged violation provide the defendant with a "direct economic benefit." *Beard, supra*, 912 F.2d at141-42 (outlining the history of the "direct economic benefit rule" and holding that *Jefferson Parish* did not displace it). Such benefit, however, must come directly from the sale of the tied product. *Id.* at 142 ("A seller who derives no direct economic benefit from sales of an alleged tied product or service is not attempting to invade the alleged tied product or service market in a manner proscribed by section 1 of the Sherman Act."). This is particularly important when "the seller of the tying product and the seller of the tied product are different entities." *CTUnify*, *supra*, 115 Fed. Appx. at 834 (unpublished).

While Toledo Trane focuses on Trane's control of the tying market (Trane-Branded products and the Trane brand), it fails to allege an anticompetitive effect in the tied market (non-Trane-branded products).[15] Toledo Trane only claims the arrangement raises the price of bundled sales in the territory. Such an allegation does not presuppose an effect in the market for non-Trane products that are part of bundled sales.

---

[15]

Toledo Trane provides conclusory allegations (e.g., "Because of Trane's appreciable economic power in the tying product, the Trane-Branded Product, in the New HVAC Unit Market and in the Trane Branded Market, Trane's tying arrangement affects a significant volume of commerce in the Territory for the Non-Trane-Branded Products" (Countercls. at ¶ 123)). These statements do not meet the *Twombly* standard. *Bell Atlantic Corp. v. Twombly*,      U.S.      , 127 S. Ct. 1955 (2007).

This disparity in the defendant's counterclaim means that Toledo Trane also fails to allege Trane's "direct economic interest in the sale" of non-Trane ancillary parts. Because Trane is not the seller of the tied product, Toledo Trane must show that Trane "derived a direct economic benefit from the sales of" the non-Trane ancillary product. *CTUnify*, *supra*, 115 Fed. Appx. at 835 (unpublished). Again, this benefit must derive from the sale of the non-Trane product to Toledo Trane, not from the sale of the bundled product to consumers.

Accordingly, I dismiss defendant's tying counterclaims (Counts One and Two).

### 3. Horizontal Restraint

In Count Four, defendant alleges that Trane's policies regarding Toledo Trane's distribution of non-Trane-branded new commercial HVAC units and controls was a horizontal non-price restraint violating § 1 of the Sherman Act and §3 of the Clayton Act. Courts usually analyze horizontal restraints under the per se standard. *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 531 (3d Cir. 2006). Based on the facts before me, however, I cannot agree that the restraint is horizontal in nature.

Horizontal restraints "involve direct competitors at a given level of the market." *Expert Masonry, Inc. v. Booner County, Ky.*, 440 F.3d 336, 344 (6th Cir. 2006). For example, an agreement between two or more manufacturers of a prescription drug to prevent a generic version of the drug from reaching consumers is a classic horizontal restraint. *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 907-08 (6th Cir. 2003).

In contrast, Trane, a manufacturer of HVAC units and controls, is primarily an upstream supplier to Toledo Trane, whether the latter is fulfilling its role as an agent, distributor, or franchisee. As a result, the relationship between the two parties "was primarily vertical." *AT&T Corp.*, *supra*,

22

470 F.3d at 531. The fact that "minimal horizontal competitive effects may have resulted" due to Toledo Trane's services as a distributor for other manufacturers of HVAC units and controls, does not change this conclusion. *Int'l Logistics Group, Ltd. v. Chrysler Corp.*, 884 F.2d 904, 906 (6th Cir. 1989); *see also AT&T Corp.*, *supra*, 470 F.3d at 531 (holding that a relationship's horizontal elements did not change the restraint from being vertical in nature); *Generac Corp. v. Caterpillar Inc.*, 172 F.3d 971, 977 (7th Cir. 1999) ("Even though in some ways the companies may have operated in similar lines of business, this particular agreement was a vertical one . . ."); *Elecs. Commc'ns Corp. v. Toshiba Am Consumer Prods.*, 129 F.3d 240, 243-44 (2d Cir. 1997) (citing cases from the Sixth, Seventh, and Tenth Circuits and Department of Justice Guidelines).

Therefore, I dismiss the defendant's horizontal restraint counterclaim (Count Four).

### 4. Ohio Valentine Act

Defendant also brings a state antitrust claim under the Ohio Valentine Act, O.R.C. § § 1331.01-1331.14 (2008). The statutes commonly known as the Valentine Act "were patterned after the Sherman Antitrust Act, and as a consequence [the Supreme Court of Ohio] has interpreted the statutory language in light of federal judicial construction of the Sherman Act." *C.K. v. J.K., Inc. v. Fairview Shopping Ctr. Corp.*, 63 Ohio St. 2d 201, 204 (1980).

To the extent that I dismiss defendant's federal antitrust counterclaims for failure to state a claim, I also dismiss the defendant's Valentine Act counterclaim. *Id.* at 204-05. For the reasons explained in the next section, however, I dismiss the Valentine Act claim in full.

### 5. Statute of Limitations

Because I find that a portion of Count Three (resale price maintenance) makes out a viable antitrust counterclaim, I consider the plaintiff's statute of limitations argument. *See DXS, Inc. v.*

23

*Siemens Med. Systems, Inc.*, 100 F.3d 462, 467, n.3 (6th Cir. 1996) (explaining that a "court usually looks first to determine whether the first chronological act alleged gives rise to an antitrust violation" and then assess whether later acts constitute new violations or reaffirmations of the initial act).

According to the Clayton Act, any cause of action under federal antitrust laws must be brought "within four years after the cause of action accrued." 15 U.S.C. § 15b. Because the state Valentine Act claim (Count Five) also has a four year statute of limitations, I will address the statute of limitations arguments on the federal and state claims together. O.R.C. § 1331.12(B) (2007).

An antitrust cause of action accrues, and the statute of limitations begins to run, "when a defendant commits an act that injures a plaintiff's business." *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 405 (6th Cir. 1999) (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). The "continuing violation" exception, however, recognizes that "a cause of action accrues each time the plaintiff is injured by an act of the defendants." *DXS, Inc.*, *supra*, 100 F.3d at 467 (quoting *Barnofsky Oils, Inc. v. Union Oil Co. of Cal.*, 665 F.2d 74, 81 (6th Cir. 1981)). This exception requires "an overt act by the defendant  .  .  .  to restart the statute of limitations." *Id.* (quoting *Peck v. General Motors Corp.*, 894 F.2d 844, 849 (6th Cir 1990). Such an act "is characterized by two elements: (1) it must 'be a new and independent act that is not merely a reaffirmation of a previous act'; and (2) it must 'inflict new and accumulating injury on the plaintiff.'" *Id.* (quoting *Pace Indus. Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987)).

Trane instituted the policy that the defendant characterizes as illegal resale price maintenance in 1992. This initial act is well outside the four year statute of limitations. Nevertheless, Toledo Trane alleges that Trane's conduct "has been a series of continuous discrete actions each day it

24

enforces MOPP 34b" and that "discrete actions within the last four years are actionable." (Doc. 59 at 33).

This allegation is not enough to invoke the continuing violation exception. In keeping with the aforementioned elements, courts generally do not regard enforcement actions as independent of the policy they aim to enforce. *See, e.g.*, *Grand Rapids Plastics*, *supra*, 188 F.3d at 406 (holding that wrongful payments made after the initial overt act "were only a manifestation of the previous agreement. . . . [and] therefore do not constitute a 'new and independent act'"); *Iron Workers Local Union No. 17 Ins. Fund and Its Trs. v. Philip Morris, Inc*., 29 F. Supp. 2d 801, 815-16 (N.D. Ohio 1998) (explaining that defendant's "misleading statements that distorted information" were not "new and independent injuries, but rather, a single, continuous course of injury"). *But cf. DXS, Inc.*, *supra*, 100 F.3d at 467 (holding that notifying third parties about a policy was a new and independent act vis-a-vis the policy, when the defendant had never taken any previous action to implement the policy). Furthermore, Toledo Trane's conclusory allegation does not raise "a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly*, *supra*,     U.S. at     , 127 S. Ct. at 1965.

I, therefore, dismiss the remainder of Count Three, and any other antitrust counterclaims based on the policies enacted via MOPP 34b, on statute of limitations grounds.

### C. Additional State Claim: Violation of Covenant of Good Faith

Plaintiff moves to dismiss Toledo Trane's claim of violation of the covenant of good faith in Count Eleven of the defendant's counterclaims.

The claim alleges that Trane breached the implied covenant when it terminated Toledo Trane's franchise agreement. *See N. Crossarm Co., Inc. v. Chem. Specialties, Inc.*, 318 F. Supp. 2d

752, 764 (W.D. Wis. 2004) ("The duty of good faith imports into contract those terms 'the parties would have inserted [ ] if they had known what the future held.' It prevents parties from taking advantage of the relationship in a manner not contemplated at the time the contract was drafted." (internal citations omitted)). Both parties agree that Wisconsin law controls per the contract's choice of law clause.

Wisconsin law recognizes an implied covenant of good faith, fair dealing, and cooperation that accompanies every contract. *See In re Chayka's Estate*, 176 N.W. 2d 561, 564, n.7 ("Every contract implies good faith and fair dealing between the parties to it, and a duty of cooperation on the part of both parties."). Conduct authorized by the express terms of a contract, however, cannot serve as the basis for a breach of implied covenant claim. *See, e.g.*, *Wausau Med. Ctr. v. Asplund*, 514 N.W.2d 34, 43 (Wis. App. 1994) ("[Defendant] could not have breached the implied covenant of good faith by terminating his contract because the contract contemplates that he could do so at any time, as long as he gave sixty days' notice, which he did."); *India Breweries Inc. v. Miller Brewing Co.*, 2007 WL 3012973 at *12 (E.D. Wis.) (explaining that under Wisconsin law, "there can be no breach of the implied covenant . . . based on acts that are specifically authorized in a contract").

The contract between Trane and Toledo Trane contains a provision providing "that it may be terminated by either party upon 30 days notice to the other." (Doc. 11, Attach 1 at 2). Trane alleges, and asserts evidence in support of its allegation, that the parties modified the contract to require cause for termination.

While Trane has suggested that it had ample cause for termination, neither that issue nor the underlying issue of whether the parties modified the contract is amenable to resolution on a motion

to dismiss.

The motion to dismiss Count Eleven shall be denied.

### Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT

Plaintiff Trane U.S. Inc.'s motion to dismiss (Doc. 46) be, and is the same hereby, granted as to all of defendant's counterclaims except as asserted in Count Eleven, alleging plaintiff's violation of the covenant of good faith.

So ordered.

<u>s/James G. Carr</u>
James G. Carr
Chief Judge